IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SARA SLATTERY,**<br>　　　　　**Plaintiff,**<br><br>　　　　v.<br><br>**MAIN LINE HEALTH, INC.,**<br>**MAIN LINE HEALTHCARE, INC., and**<br>**MAIN LINE HEALTH INTEGRATIVE**<br>**AND FUNCTIONAL MEDICINE**<br>**SERVICES,**<br>　　　　　**Defendants.** | CIVIL ACTION<br><br><br><br>NO.  22-4994 |

**MEMORANDUM**

**HODGE, J.**                                                                                                                  **March 25, 2025**

　　　　Dr. Sara Slattery ("Plaintiff") brings claims against Main Line Health, Inc., Main Line Healthcare, Inc., and Main Line Health Integrative and Functional Medicine Services (collectively, "Defendants") alleging that she was denied a COVID-19 vaccination exemption based on her sincerely held religious beliefs as an Evangelical Christian. Dr. Slattery brings claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA") for disparate treatment and for failure to accommodate based on her religious views.

　　　　On December 15, 2022, Plaintiff Dr. Sara Slattery filed a Complaint against Defendants Main Line Health, Inc., Main Line Healthcare, Inc., and Main Line Health Integrative and Functional Medicine Services for employment discrimination. (ECF No. 1.) On January 29, 2024, Defendants jointly filed a Motion to Exclude Plaintiff's Expert Reports and Opinions (also known as a *Daubert* Motion) and a Motion for Summary Judgment. (ECF Nos. 21 & 22.) Oral Argument on the Motion for Summary Judgment was held on November 14, 2024.

In response to Defendants' Motion for Summary Judgment (ECF No. 22), Plaintiff relies heavily on the opinions of two experts: Dr. Peter McCullough and Dr. Akram Boutros. Dr. McCullough was retained to opine on the reasonableness of Plaintiff's belief system as based on her understanding of COVID-19 and also to provide a rebuttal to the report of Dr. Daniel Salmon, Defendants' expert who provides an expert opinion on Defendants' undue hardship defense. Dr. Akram Boutros was also retained by Plaintiff and asked to write a rebuttal report addressing Dr. Salmon's conclusions on undue hardship.

For the following reasons, Defendants' Motion to Exclude Plaintiff's Expert Report and Opinions is granted. The Court will not consider the Reports and Opinions of Dr. McCullough and Dr. Boutros.

I.       FACTUAL BACKGROUND[1]

Dr. Sara Slattery seeks to recover damages against Main Line Health, Inc., Main Line Healthcare, Inc., and Main Line Health Integrative and Functional Medicine Services for refusal to grant Plaintiff a religious exemption from its mandatory COVID-19 vaccination policy. (ECF No. 1 at 2.)

Defendant corporations Main Line Health Integrative and Functional Medicine, Inc. ("Integrative Medicine") and Main Line Healthcare are under the operation and control of Main Line Health, Inc. (ECF No. 1 ¶¶ 17, 18.) Plaintiff Sara Slattery is a physician, whose specialty is in integrative and regenerative medicine, and was employed by Integrative Medicine beginning on March 2, 2020. (ECF No. 1 ¶¶ 5, 20.) Plaintiff was initially employed as the Medical Director of the Main Line Health Integrative and Functional Medicine Services Program, and Integrative Health was the identified employer on her employment contract. (ECF No. 1 ¶¶ 16, 20.) The

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

employment contract between Plaintiff and Integrative Medicine required Plaintiff to follow all policies and procedures of Main Line Health, Inc.'s hospital medical staff. (ECF No. 1 ¶ 23.) The employment contract was modified around September 24, 2020, to identify Main Line Healthcare as Plaintiff's employer and designated Plaintiff as Medical Director of the Dee Adams Center for Integrative and Regenerative Medicine, effective January 1, 2021. (ECF No. 1 ¶¶ 25–26.)

In July 2021, Defendant Main Line Health, Inc. announced a mandatory COVID-19 vaccination requirement that required employees to be vaccinated by November 30, 2021 unless they received a religious or medical exemption. (ECF No. 1 ¶ 29; ECF No. 22-1 at 9.)

Plaintiff is a practicing Evangelical Christian. (ECF No. 1 ¶ 15.) Plaintiff requested a religious exemption from taking the COVID-19 vaccine on September 2, 2021, by submitting a narrative statement and completing a required questionnaire from Main Line Health, Inc. (ECF No. 1 ¶ 30.) Plaintiff stated the following in her narrative:

> The Pfizer and Moderna mRNA vaccines and Janssen's virus-delivered DNA vaccine injects foreign genes into people. I believe this violates God's intended design for my makeup. The vaccines deliver foreign RNA or DNA to manipulate human cells to generate "spike" proteins and then an immune response which lasts until death, thereby permanently altering each person's cellular makeup as created by God. These vaccines are gene therapy products that change a person's genetic composition as created in the image of God. Other vaccines do not include gene therapy. . . By taking a gene therapy product, I believe I would be distorting the image of God. . . I believe the Covid-9 [sic] vaccines would alter my genetic makeup and change God's creation as intended. . . The Bible teaches that I am a temple with the indwelling Holy Spirit. I think the genetically based vaccines defile God's temple. . .The technology used in these vaccines differs from all other vaccines because they contain foreign genetic material that would directly coerce my body into making foreign proteins, which other vaccines do not do. . . .

(ECF No. 1-3 at 12.) Plaintiff's religious exemption request was reviewed by the Main Line Health Religious Exemption Committee[2] and denied on September 24, 2021. (ECF No. 1 ¶ 33;

---

[2] The Religious Exemption Committee at Main Line Health consisted of a chaplain, doctors, and HR professionals. (ECF No. 21, at 22.)

3

ECF No. 22-1 at 5.) The Committee stated as the basis for its decision that Plaintiff did not "state a basis why [her] religious belief requires [her] to decline the COVID-19 vaccination." (ECF No. 1 ¶ 33.) In response, Plaintiff submitted an appeal request on September 28, 2021, which did not include additional information, only that she "stand[s] by [her] religious convictions" and that she had COVID as of September 14, 2021, and had "recovered. [sic] with natural immunity." (ECF No. 1 ¶ 34.)

On October 8, 2021, Defendant Main Line Health, Inc. denied Plaintiff's appeal for the same stated reason as the initial denial. (ECF No. 1 ¶ 37.) Plaintiff subsequently received a letter dated October 13, 2021 from Eric Mankin, President of Main Line Healthcare, informing Plaintiff that she was in material default of her contract for her failure to receive the COVID-19 vaccination and the only remedy available was to submit to vaccination. (ECF No. 1 ¶ 38.) Plaintiff submitted an additional statement to the Religious Exemption Committee on October 17, 2021, that summarized her religious beliefs based on Evangelical Christianity. (ECF No. 1 ¶ 39.)

On October 19, 2021, Plaintiff received a call from the Main Line Health President, John J. Lynch, who informed her that no further appeal was available to her. (ECF No. 1 ¶ 40.) On October 20, 2021, Plaintiff sent a letter to Mr. Lynch summarizing their phone call from the day prior. (ECF No. 1 ¶ 41.) On October 21, 2021, Plaintiff received an email from Mr. Lynch stating in part: "I am not involved in the exemption review process," and that "it is my understanding that your [October 17, 2021] late resubmission was in fact reviewed and given additional consideration." (ECF No. 1 ¶ 44.)

Main Line Health's policy was to terminate employees who were not approved for an exemption and who declined to receive the COVID-19 vaccine by November 1, 2021. (ECF No.

4

22-1 at 14.) During a phone call with Plaintiff, John Schwarz,[3] Plaintiff's direct supervisor, told Plaintiff she was being discharged because her religious exemption request did not satisfy the criteria of the Religious Exemption Committee. (ECF No. 1 ¶ 47.)

## II.   LEGAL STANDARD

Defendants move to exclude the expert reports and opinions of Dr. Peter McCullough and Dr. Akram Boutros under Rule 702 of the Federal Rules of Evidence. Fed. R. Evid. 702. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

As opposed to a lay witness, who may only provide testimony that results from a process of reasoning familiar in everyday life, an expert witness may testify as to subjects that are mastered by specialists in a particular field. *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 80–81 (3d Cir. 2009). The Court considers three main prongs in evaluating the admissibility of an expert opinion: qualifications, reliability, and fit. *Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025). The Court is tasked with engaging in a "*rigorous* gatekeeping function" to "ensure

---

[3]   John Schwarz's full title is President of Bryn Mawr Hospital and President of its Integrative and Functional Medicine Program. The Court notes that John Schwarz is alleged to be an agent of Defendant System. (ECF No.1 ¶ 24.)

that 1) the expert is qualified; 2) the proposed testimony is reliable and concerns matter requiring scientific, technical, or specialized knowledge; and 3) the expert's testimony is sufficiently tied to the facts of the case." *Id.* (emphasis added) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993)). The Court's gatekeeping function is "necessarily flexible, granting district courts latitude in deciding *how* these requirements are met." *Id.* (emphasis in original) (internal citations omitted).

    A. Qualifications

In order to be deemed qualified, a proffered expert must possess the necessary skills, knowledge, education, experience, and training to express an expert opinion. When evaluating the qualifications of an expert, the court considers not only their skills, knowledge, education, experience, or training in general but also whether their specific practice area is relevant to the issues at hand. The qualifications requirement is "liberally interpreted and includes a broad range of knowledge, skills, and training." *In re TMI Litig.*, 193 F.3d 613, 664 (3d Cir. 1999) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994)).

    B. Reliability

The Court must ensure that an expert's testimony is "based on the methods and procedures of science, not on subjective belief and unsupported speculation." *Cohen*, 125 F.4th at 461–62 (citing *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80–81 (3d Cir. 2017)) (internal quotations omitted). The Court looks to whether the testimony is "supported by good grounds." *Id.*, at 462 (citing *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020)). This inquiry applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, and the link between the facts and conclusion. *Id.* (citing *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012)). There is no definitive

6

checklist in determining whether there are "good grounds" supporting an expert's testimony, however, there are several factors that a Court may consider in making this evaluation:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*UGI Sunbury*, 949 F.3d at 834 (citing *Pineda v. Ford Motor Co.*, 520 F.3d 237, 247–48 (3d Cir. 2008)). No single factor is dispositive; rather, the Court looks at the totality of the circumstances in making a determination of reliability. *Id.*

C. Fit

An expert's testimony satisfies the fitness prong if "it will help the trier of fact to understand the evidence or to determine a fact in issue." *Cohen*, 125 F.4th at 464 (quoting Fed. R. Evid. 702). "Fit" is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. *Id.* This is essentially a relevance determination. In short, an expert's testimony will be excluded if the scientific knowledge presented is not relevant to the determination of the facts in the present case. *Id.* Rule 401 provides that evidence is relevant if it "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

III. DISCUSSION

A. Dr. Peter McCullough's September 2023 Report

Dr. McCullough's expert report was requested "following early depositions taken of the Defendants' agents." (ECF No. 23-2, at 12.) Dr. McCullough was retained to opine on the

"reasonableness of [Plaintiff's] belief system based upon her understanding of COVID-19." (ECF No. 23-2, at 12 (citing ECF No. 21-3, at 6–7).) Dr. McCullough primarily discusses the COVID-19 vaccine and the science behind the vaccine, specifically whether the COVID-19 vaccine is a "gene-therapy" product. (*See generally* ECF No. 21-3.) Dr. McCullough also discusses Plaintiff's belief system and the nature of the vaccine. (*Id.*)

i. *Qualifications*

In determining whether Dr. McCullough is a qualified expert, the Court must first turn to the purpose for Dr. McCullough's testimony. Dr. McCullough, in his own words, was "asked to opine on whether [Dr. Slattery's] religious beliefs demonstrated a valid belief system based upon her understanding of Covid. [Dr. McCullough] was also asked to opine on whether these clinical issues were of such gravity as to warrant the denial of religious exemption requests." (ECF No. 21-3, at 6–7.)

Dr. McCullough is a medical doctor and a board-certified cardiologist and internist. (ECF No. 21-4.) Dr. McCullough received his medical degree from the University of Texas Southwestern Medical School with impressive ranks, holds a master's degree in public health with a specialty in Epidemiology from the University of Michigan, and has extensive training as a cardiologist and in internal medicine. (ECF No. 21-4.) There is no doubt that Dr. McCullough would be qualified to testify as to a field of *medicine* that he has experience and knowledge in, such as internal medicine or cardiology, as it is well settled that the standard for an expert's specialized knowledge is interpreted liberally. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). However, even considering this liberal standard, Dr. McCullough is not qualified to opine on religious matters.

The fact that the religious question at issue in Dr. Slattery's case involves her views on the mechanics of the COVID-19 vaccine does not transform the religious question into a scientific one. Dr. McCullough, in discussing the purpose of his report, does not proffer that he will be discussing medical issues. Dr. McCullough was tasked with offering opinions on whether Dr. Slattery's *religious beliefs* demonstrated a valid belief system in addition to discussing whether the denial of her religious exemption request was warranted. (ECF No. 21-3, at 6–7.) In Dr. McCullough's conclusion he writes: "In summary, Dr. Slattery's sincerely held religious beliefs reflected her beliefs founded upon Christianity." (ECF No. 21-3, at 38.) Dr. McCullough discusses "Christian religious beliefs" and scripture in his report. (*See* ECF No. 21-3, at 13.) He also concludes that "[a]ny religious belief that incorporates this fact [that vaccines are gene therapy] cannot be validly based on 'bad science' nor does this fact negative [sic] the spirituality of being created in the image of one's Deity." (ECF No. 21-3, at 15.) None of these statements are scientific in nature.

Plaintiff has consistently admitted that this case is one about religion, not science. During oral argument on the pending Motion for Summary Judgment, Plaintiff's counsel stated that "[t]his case is not about the safety of the vaccine. It's not about the efficacy of the vaccine. Again, it's a religious exemption request that Dr. Slattery made based upon her sincerely held religious beliefs." (ECF No. 30, 32:13–22.) Plaintiff even criticized Defendants for "spen[ding] a lot of time talking about science," when "[t]he thing this case really comes down to [is] a Christian's request for a religious exemption from taking the COVID vaccine." (ECF No. 30, 32:13–17.) Plaintiff has made clear that the present case is about religion, not science. This is further evidenced by Plaintiff arguing that "the science is irrelevant." (ECF No. 30, 34:9–10.)[4] Therefore,

---

[4] The Court acknowledges that the full quotation in the transcript is: "the science is irrelevant until the point the defense tries to use it to argue that it is relevant." (ECF No. 30, 34:9–11.) However, the discussion at present is

the Court does not see how a medical doctor is qualified to discuss the religious beliefs of Dr. Slattery. With all due respect to Dr. McCullough and his knowledge, training and experience as a medical doctor, Dr. McCullough is not an expert in religion. Nowhere in his Curriculum Vitae ("CV"), nor his report, does he include any qualifications related to religion. Thus, while the court is given the latitude and discretion based on precedent, the totality of the circumstances do not support Dr. McCullough's report and opinion as being fit for this case determination. Dr. McCullough is not qualified to testify as to religious beliefs or belief systems and, therefore, the Court will grant the *Daubert* motion as to those conclusions due to Dr. McCullough's inadequate qualifications. Dr. McCullough's testimony is excluded under the qualification prong of *Daubert*.[5]

---

one of Dr. McCullough's expert reports, not any rebuttal report to Defense's experts. The Court will consider the rebuttal report separately.

[5] The Court finds it appropriate to mention at this juncture that the parties have extensively argued issues of whether the COVID vaccine is "gene therapy" or about "asymptomatic spread" or about "herd immunity" or "anti-vaccination." This case is not about the science underlying the COVID-19 vaccine (though to the extent the actual science is relevant, the Court relies on the research of qualified infectious disease experts, public health officials, and immunologists). This case is about whether Dr. Slattery had *religious* beliefs, whether she sincerely held those religious beliefs, and whether she was disciplined for her failure to comply with a conflicting requirement. *Gray v. Main Line Hosp., Inc.*, 717 F. Supp. 3d. 437, 445–46 (E.D. Pa. 2024) (discussing the elements necessary to establish a *prima facie* case of a failure to accommodate claim based on religious views) (citing *EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 271 (3d Cir. 2010)). In fact, much of this case has been agreed upon: that Dr. Slattery did have sincerely held beliefs, that she informed her employer of the conflict between her views and the requirement to take the COVID-19 vaccine, and that she was disciplined for doing so. The only things in contention in this case are whether Dr. Slattery's beliefs were religious in nature (as opposed to scientific) and whether it would have been an undue hardship for the Defendants to accommodate her religious beliefs. There are also disparate treatment claims that do not hinge on expert testimony. The accuracy of the science behind Dr. Slattery's belief is not relevant for the purposes of evaluating Dr. Slattery's religious beliefs.

It does not matter, in evaluating whether Dr. Slattery was discriminated against, whether or not her beliefs about COVID being a product of gene-therapy are true. In the same way, the Court is not tasked with deciding whether the beliefs that inform Dr. Slattery's identity as an evangelical Christian are "true." Defendants' argument, in regard to Plaintiff's *prima facie* case, is that Dr. Slattery held scientific views, and not religious ones because scientific views are not protected under Title VII. This question, of whether Dr. Slattery held religious versus scientific views, does not hinge on whether the information underlying the views is accurate or not. As the Court has recognized before, Plaintiff has admitted that the "science is irrelevant." The Court agrees.

B. Dr. Peter McCullough's Rebuttal Report

The Court will now address Defendants' argument that Dr. Peter McCullough's rebuttal report should be excluded. Dr. McCullough's rebuttal report primarily responds to Defendants' expert Dr. Daniel Salmon, who was retained by Defendants to provide an expert report on Defendants' undue hardship defense.[6] (ECF No. 21, at 15–16.) Dr. Salmon made the following conclusions:

> In September 2021, COVID-19 was a substantial threat to staff and patients in health care institutions. Health care staff were disproportionately impacted by COVID-19 and patients in health care settings were at increased risk of serious disease and death because of underlying health conditions and/or age. Consequently, health care personnel were the first priority for vaccination by the ACIP and CDC when vaccine supplies were limited. There were three vaccines approved for use at the time, and they had been shown to be very safe and effective at preventing diseases, reducing transmission of disease, and serious consequences from COVID-19 including death. Consequently, unvaccinated persons in health care settings were at greater risk of COVID-19 themselves, and also posed risk to others they came into contact with. While many health care workers had already been infected at this time, natural immunity was poorly understood and not a substitute for vaccination. Mandatory COVID-19 vaccine policies were necessary in health care settings given the need for extremely high vaccine coverage necessary in health care settings and inadequate vaccine coverage that could be accomplished through education and access to free vaccine. The small number of persons with valid medical contraindications to vaccination must be given medical exemptions to mandatory policies. Health care institutions often also allowed religious exemptions for persons with sincerely held religious beliefs against vaccination. However, these health care institutions needed to limit exemptions to those persons with sincerely held religious beliefs that precluded vaccination in order to protect their staff and patients. Easily granting religious exemptions to all persons who requested them, including those without sincerely held religious beliefs precluding vaccination, would have undermined the vaccine requirement leading to substantial disease, disability and death among health care staff and patients.

(ECF No. 21-5, at 50.) Dr. McCullough, in his rebuttal report, primarily responds to the expert report of Dr. Salmon, directly rebutting several of Dr. Salmons conclusions. Dr. McCullough

---

[6] Dr. McCullough also responds to the hybrid disclosures of Dr. Jonathan Stallkamp and Dr. Brett Gilbert, experts for the Defense, although the vast majority of Dr. McCullough's report is focused on Dr. Salmon's conclusions.

11

states that "Dr. Salmon asserts several misleading and inaccurate comments in his summary." (ECF No. 21-6, at 49.) Dr. McCullough specifically asserts the following:

> *Robust evidence showed that SARS-CoV-2 was mostly likely to spread at home. Further, spread was driven primarily by symptomatic people. It was also widely known that vaccinated people were indeed unwittingly spreading the virus. . . . It is not accurate to say that the vaccines were very safe. Safety concerns were beginning to emerge and were widely documented. In addition, efficacy greatly reduced by the three month mark. Interestingly, the FAQ document that Main Line Health published claimed that mRNA vaccines have a long history of safety despite not a single one being FDa [sic] approved for marketing at the time it was published. . . . There is no evidence that unvaccinated persons posed any greater risk than vaccinated persons. . . . Natural immunity was already shown to be effective against preventing future disease and was a completely logical and scientifically justified substitute for vaccination. . . . There is no objective way to* [limit vaccine exemptions to those persons with sincerely held religious beliefs that precluded vaccination] *and therefore Main Line Health created subjective tests based upon its indefensible science positions. . . . If MLH had granted religious exemptions to every single person who applied for exemption, MLH could have still achieved extremely high vaccination levels. Religious exemptions were requested by less than 1% of all MLH staff. This would not have undermined the vaccine requirement, nor led to substantial disease, disability, and death.*

(ECF No. 21-6, at 49–50 (emphasis in original).)

       *i. Qualifications*

The Court will address Dr. McCullough's qualifications in relation to the conclusions made in the rebuttal report. Dr. McCullough is a board-certified Internist and Cardiologist. (ECF No. 21-4.) He has received a master's degree in public health (with a focus on epidemiology). (*Id.*) However, prior to the COVID-19 pandemic, his practice was entirely internal medicine. (*Id.*) The Court questions, and is therefore not convinced of, Dr. McCullough's qualifications to opine on COVID-19. Not only has Dr. McCullough never *practiced* in the field of epidemiology, (*See* ECF No. 21-4), but his presence in this field did not begin until the COVID-19 pandemic began in early 2020. The Court is unwilling to certify an expert on a relatively novel virus when they have had no previous experience with epidemiology, immunology, or infectious disease.

12

This Court is not alone in being skeptical about Dr. McCullough. A District Court in Nebraska wrote that "[n]ot only is it doubtful that Dr. McCullough's credentials demonstrate that he is an expert on COVID-19, Dr. McCullough makes several claims that are outside the conclusions of the mainstream of the vast scientific studies of the COVID-19 virus and COVID-19 vaccination." *See Roth v. Austin*, 603 F. Supp. 3d 741, 774 (D. Neb. 2022). That Court further concluded that "Dr. McCullough is hardly a 'real expert' in the field." *Id.* The District Court for the District of Columbia further discussed the problematic nature of Dr. McCullough's testimony, noting that "a battery of medical authorities contest Dr. McCullough's positions." *Navy SEAL 1 v. Austin*, 600 F. Supp. 3d 1, 16 (D. D.C. 2022) (abrogated on other grounds). Additionally, a fact and concern that has been noted by a fellow District Court, Dr. McCullough has previously had a preliminary injunction issued against him for making false statements, specifically claiming that he was affiliated with Baylor University after he was fired for spreading medical, COVID-related misinformation. *Id.* (citing Order at 2, *Baylor Scott & White Health v. McCullough*, No. DC-21-09699 (Tex. 191st Dist. July 29, 2021)).[7] These comments by other courts do not only implicate Dr. McCullough's qualifications but also have an impact on the reliability of his testimony, which will be discussed later.[8] At this juncture, the Court concludes that Dr. McCullough is not qualified to give opinions related to COVID-19, the COVID-19 vaccine, or the public health response to COVID-19, and will strike his rebuttal report from the record.

---

[7] The Court recognizes that these courts did not evaluate Dr. McCullough within the context of a *Daubert* motion. However, the Court notes the decisions and comments on Dr. McCullough that other district courts have made about Dr. McCullough's qualifications to opine on the COVID-19 pandemic are relevant and noteworthy.

[8] While the Court has already determined that Dr. McCullough is not qualified to provide a rebuttal report in this case, the Court will nonetheless address the reliability of his methods. Qualifications and reliability are not completely separate discussions, however, because an expert's "level of expertise may affect the reliability of the expert's opinion." *Main St. Mortg., Inc. v. Main St. Bancorp., Inc.*, 158 F. Supp. 2d 510, 513 (E.D. Pa. 2001) (citing *Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)).

## ii. Reliability

As the Defense has stated, Dr. Salmon's report was made with the purpose of addressing Defendants' undue hardship defense to a failure to accommodate claim. Dr. McCullough takes issue with many of Dr. Salmon's conclusions as seen above. *See supra* Section B. Dr. McCullough responds by offering opinions about asymptomatic transmission, natural immunity, the dangers of the COVID-19 vaccine for individuals who have already had COVID, and other anti-vaccine sentiments. The Court will address the reliability of his opinions within the context of factors enumerated by the Supreme Court in *Daubert* and the Third Circuit in *UGI Sunbury*. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993); *UGI Sunbury LLC v. A Permanent Easement for 1.7575* Acres, 949 F.3d 825, 832 (3d Cir. 2020).

The Court will first address Dr. McCullough's conclusions on asymptomatic transmission in health care facilities. He concludes that "[a]symptomatic transmission was not common." (ECF No. 21-6, at 3.) Dr. McCullough further makes the conclusory statement that "asymptomatic spread [of COVID] is trivial and inconsequential." (*Id.*) Instead of providing an academic study to support his conclusions on asymptomatic spread, Dr. McCullough cites to an article saying "[a]t least 74% of Covid cases occurred in fully vaccinated persons, resulting in transmission from vaccinated individuals." (*Id.*) This article does not address asymptomatic spread and when asymptomatic spread is mentioned, the article states that "asymptomatic breakthrough infections might be underrepresented because of detection bias." https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm. Furthermore, Dr. McCullough cites to an article published in the Journal of the American Medical Association ("JAMA") stating asymptomatic spread was "negligible at 0.7%." (ECF No. 21-6, at 3 (citing https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774102).) Not only does the

14

article cited not use the word "negligible," the article explicitly discusses *household transmissions* and not transmissions in health care facilities, which is the header of this portion of Dr. McCullough's report. (ECF No. 21-6, at 3 ("How did asymptomatic transmission impact the spread of COVID-19 in health care facilities?").) Dr. McCullough next attempts to cite articles discussing asymptomatic transmission but those studies were from China, Germany, and parts of South Asia. (ECF No. 21-6.) None of those studies make any conclusions on asymptomatic transmission in the United States, nor in health care facilities, which was the focus of Dr. Salmon's conclusions.

      Dr. McCullough also makes the grand statement that "there was less viral spread in the health care setting than many other places, including at home because of universal precautions and masking efforts." (ECF No. 21-6, at 7.) Dr. McCullough does not support that proposition with a citation, nor does he support his further contention that "[e]mployees and patients were more likely to get Covid at home than *at a MLH* [Main Line Health] *office* where the staff could be testing daily and taking precautionary measures." (*Id.* (emphasis added)) Dr. McCullough continues on to discuss Main Line Health, specifically, without any discussion as to how this conclusion would apply to Main Line Health. Furthermore, Dr. McCullough chooses to cite news networks such as "ABC" and "CNN" to support his conclusions without explaining how they are reliable. (ECF No. 21-6, at 7.) Dr. McCullough cites scientific articles with numerous deficiencies and limitations despite those articles' authors acknowledging these limitations, however and notably, Dr. McCullough fails to do the same in his report. Instead, he takes them as absolute fact, ignoring the limitations of the studies that he cites.

      Dr. McCullough makes several claims about the efficacy of the COVID-19 vaccine. (ECF No. 21-6, at 49.) These allegations explicitly contradict statements about the vaccine made by the

15

Centers for Disease Control and Prevention ("CDC").[9] In addition, Dr. McCullough blatantly states false facts in support of his conclusion. Dr. McCullough claims without support that "[t]here has been no study demonstrating clinical benefit with COVID-19 vaccination in those who have had well documented or even suspected prior COVID-19 illness." (ECF No. 21-6, at 23.) Dr. Eric Feigl-Ding, one of Defendants' experts, explicitly rebuts this statement, citing a 2022 study which states that "[a] single dose of vaccine after infection reinforced protection against reinfection." (ECF No. 21-9, at 6 (citing https://www.nejm.org/doi/full/10.1056/NEJMoa2118946).) In the face of such balanced, tested and fact-based contradictions to Dr. McCullough's statements, the Court cannot reliably trust the information proffered by Dr. McCullough, because he has blatantly misrepresented the studies available, as apparent by even a cursory review of the sources cited by him. The Court must exercise its gatekeeping function to prevent a fact finder from hearing blatantly wrong and unreliable statements of purported science.

At this stage, it is clear that Dr. McCullough uses limited, and unreliable, sources to support his propositions. In addition to making factually inaccurate statements, Dr. McCullough fails to even suggest that his sources are legitimate. He does not actually provide any unique methodology, does not discuss whether the studies he cites have been subject to peer review, does not discuss error rates of the studies, and does not discuss the general acceptance of any

---

[9] The CDC has consistently stated that vaccines are safe and effective to use. The Court takes judicial notice, notes, and incorporates, the CDC information available at https://www.cdc.gov/covid/vaccines/benefits.html into its Opinion. Specifically, the CDC states that "Getting vaccinated against COVID-19 has many benefits that are supported by scientific studies. The COVID-19 vaccine helps protected you from severe illness, hospitalization, and death." https://www.cdc.gov/covid/vaccines/benefits.html. The CDC advises that the COVID-19 vaccine reduces an individual's risk of getting a critical illness, being hospitalized, having to go to the hospital, and for long COVID. *Id.* Furthermore, the CDC states that "COVID-19 vaccines underwent the most intensive safety analysis in U.S. History." *Id.* "The FDA has determined COVID-19 vaccines meet FDA's safety and efficacy standards." https://www.cdc.gov/covid/vaccines/faq.html. Importantly, the CDC states "COVID-19 vaccines *do not* alter DNA." https://www.cdc.gov/covid/vaccines/myths-facts.html (emphasis added). Courts have routinely relied on CDC recommendations in their decisions. *See Doe 1 v. Perkiomen Valley Sch. Dist.*, 585 F. Supp. 3d 668, 689–90 (E.D. Pa. 2022); *Messina v. Coll. of N.J.*, 566 F. Supp. 3d 236, 248 (D. N.J. 2021); *Valdez v. Lujan Grisham*, 2022 WL 3577112, at *12–13 (D. N.M. 2022.); *Mays v. Dart*, 974 F.3d 810, 823 (7th Cir. 2020); *Norris v. Stanley*, 2022 WL 557306, at *5 (W.D. Mich. Feb. 22, 2022).

methodology. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994) (requiring a judge at the district court level to engage in a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid") (citing *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993)). Dr. McCullough's expert report is simply a resuscitation of a few hand-picked articles which are contrary to CDC and FDA guidance available at the time in question. Dr. McCullough repeatedly makes grand and conclusory assertions that are unsupported by studies or are outright incorrect. The Court reminds the Plaintiff that it is *their* burden to demonstrate that Dr. McCullough meets the *Daubert* criteria. *Bardo v. Norfolk S. Ry. Co.*, 459 F. Supp. 3d 618, 624 (M.D. Pa. 2020) ("The proponent of the expert 'bears the burden of establishing the reliability and admissibility of the expert's testimony.'") (quoting *Burke v. TransAm Trucking, Inc.*, 617 F. Supp. 2d 327, 330–31 (M.D. Pa. 2009)). It is not the Court's job to search for the reliability of his methods through piecemeal articles cited to support conclusions that veer far from main-stream science and, more importantly, that veer far from the guidance available to Defendants at the time of their decision to terminate Plaintiff. Plaintiff has failed to meet its burden. The Court concludes that Dr. McCullough's rebuttal report is based on unreliable principles, methods, and information and, therefore, must be excluded.

C. Dr. Akram Boutros's Rebuttal Report

Dr. Akram Boutros, like Dr. McCullough, was asked by the Plaintiff to provide a rebuttal report addressing Dr. Salmon's conclusions.[10] Dr. Boutros makes the following conclusions to rebut Dr. Salmon's report:

> I am unconvinced that . . . the need for robust Policy mandate causes operational hardships imposed by exemptions and alternatives to vaccination. To the contrary, not providing medical and religious exemptions to the COVID-19

---

[10] Like Dr. McCullough, Dr. Boutros also responds to the hybrid disclosures of Dr. Jonathan Stallkamp and Dr. Brett Gilbert, experts for the Defense, although the vast majority of Dr. Boutros's report is focused on Dr. Salmon's conclusions.

17

> vaccination mandate increases the risk to the community by reducing the number of healthcare professionals available to care for a community in need. . . . [Dr. Stallkamp's] view that "any exemptions to the Policy mandate gave rise to significant (more than de minimis) operational hardships," is not what responsible and reasonable healthcare executives hold as factual. . . . Religious beliefs are hard for businesses to evaluate because no individual, panel of experts, or institution can create a litmus test for what is in someone's heart or head. Consequently, most healthcare opted for processes that were fairly communicated, and universally applied to provide the exemptions. In addition, COVID-19 vaccinated staff were still being infected and reducing the number of professional staff to care for the surge of patients. Staff that were provided medical and religious exemptions effectively utilized the same alternative control measures (social distancing, handwashing, and masking) to control spread of COVID-19. Finally, institutions that allowed a larger number of exemptions did not experience larger number of staff or community infections.

(ECF No. 21-7, at 13–14.)

### i. Reliability

An expert must employ in the courtroom the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). "It would be unacceptable to cite no sources for statistical evidence in a scholarly work, and it is likewise unacceptable in an expert disclosure." *Erickson v. Baxter Healthcare, Inc.*, 131 F. Supp. 2d 995, 1000 (N.D. Ill. 2001); *Korbe v. Doug Andrus Distrib., LLC*, 2024 WL 2702149, at *4 (D. Colo. 2024).

Dr. Boutros makes many claims in his expert report. However, not one of these claims, aside from citations relating to Dr. Slattery's exemption request, Dr. Salmon's report, hybrid witness disclosures, the EEOC compliance manual, and the Center for Medicare and Medicaid Services Rules, is supported by any citations or sources. Dr. Boutros only cites documents intrinsic to the case and provides no external sources of medical information or any methodology in evaluating the intrinsic sources that would support an expert opinion. Dr. Boutros does not introduce any testimony relating to any method, the reliability of that method, any error rate,

standards of control, whether the method is generally accepted, relationship of technique to that method, and uses of that method. *See UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020). Dr. Boutros simply states that his "professional judgment in these areas is based upon a review of current scientific evidence and current information available of the impact of religious exemptions and masking on the spread of COVID-19." (ECF No. 21-7, at 7.) This is not sufficient for if it were, anyone could read similar sources, fashion an opinion and purport their expertise.

Dr. Boutros makes numerous conclusory claims without support for any of his propositions. For example, Dr. Boutros claims that "the overwhelming majority of COVID-19 cases in patients and staff in healthcare facilities were a result of community transmission." (ECF No. 21-7, at 8.) However, Dr. Boutros provides no support for this proposition. He also claims that "[e]xemptions from mandatory vaccination policy have not been found to undermine healthcare institutions' ability to inhibit the spread of a serious communication disease." (ECF No. 21-7, at 11.) Dr. Boutros cites no support for this proposition either. These are but two examples of many that demonstrate Dr. Boutros' failure to provide support for his claims. The Court cannot in good faith simply accept Dr. Boutros's claims as true, without him providing any information on the reliability of this information. Dr. Boutros has failed to meet the *Daubert* standard for reliability and his conclusions in his rebuttal report will be excluded. Because of his failure to meet the reliability prong of *Daubert*, there is no need to evaluate his qualifications or fitness.

D. **CONCLUSION**

For the reasons stated above, the Court will grant Defendants' Motion to Exclude Plaintiff's Expert Testimony. The expert reports of Dr. Peter McCullough and Dr. Akram Boutros will be excluded in their entirety.

BY THE COURT:

/s/ Hon. Kelley B. Hodge

HODGE, KELLEY B., J.