IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SARA SLATTERY,<br>    Plaintiff,<br><br>v.<br><br>MAIN LINE HEALTH, INC.,<br>MAIN LINE HEALTHCARE, INC., and<br>MAIN LINE HEALTH INTEGRATIVE<br>AND FUNCTIONAL MEDICINE<br>SERVICES,<br>    Defendants. | CIVIL ACTION<br><br><br><br>NO.  22-4994 |

J. HODGE                                                                          June 25, 2025

**MEMORANDUM**

Dr. Sara Slattery ("Plaintiff") brings claims against Main Line Health, Inc., Main Line Healthcare, Inc., and Main Line Health Integrative and Functional Medicine Services (collectively, "Defendants") alleging that she was denied a COVID-19 vaccination exemption based on her sincerely held religious beliefs as an Evangelical Christian. Dr. Slattery brings claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA") for disparate treatment and for failure to accommodate based on her religious views.

On December 15, 2022, Plaintiff Dr. Sara Slattery filed a Complaint against Defendants Main Line Health, Inc., Main Line Healthcare, Inc., and Main Line Health Integrative and Functional Medicine Services for employment discrimination. (ECF No. 1.) On January 29, 2024, Defendants jointly filed a Motion to Exclude Plaintiff's Expert Reports and Opinions (a *Daubert* Motion) and a Motion for Summary Judgment. (ECF Nos. 21 & 22.) Oral Argument on the Motion for Summary Judgment was held on November 14, 2024.

For reasons that follow, the Court grants the Defendant's Motion for Summary Judgment after finding that there is no genuine dispute of material fact as to whether Plaintiff had a sincerely held *religious* belief with regards to her COVID-19 vaccination exemption request.

## I. FACTUAL BACKGROUND[1]

Dr. Sara Slattery seeks to recover damages against Main Line Health, Inc., Main Line Healthcare, Inc., and Main Line Health Integrative and Functional Medicine Services for refusal to grant Plaintiff a religious exemption from its mandatory COVID-19 vaccination policy. (ECF No. 1 at 2.)

Defendant corporations Main Line Health Integrative and Functional Medicine, Inc. ("Integrative Medicine") and Main Line Healthcare are under the operation and control of Main Line Health, Inc. (ECF No. 1 ¶¶ 17, 18.) Plaintiff Sara Slattery is a physician, whose specialty is in integrative and regenerative medicine, and was employed by Integrative Medicine beginning on March 2, 2020. (ECF No. 1 ¶¶ 5, 20.) Plaintiff was initially employed as the Medical Director of the Main Line Health Integrative and Functional Medicine Services Program, and Integrative Health was the identified employer on her employment contract. (ECF No. 1 ¶¶ 16, 20.) The employment contract between Plaintiff and Integrative Medicine required Plaintiff to follow all policies and procedures of Main Line Health, Inc.'s hospital medical staff. (ECF No. 1 ¶ 23.) The employment contract was modified around September 24, 2020, to identify Main Line Healthcare as Plaintiff's employer and designated Plaintiff as Medical Director of the Dee Adams Center for Integrative and Regenerative Medicine, effective January 1, 2021. (ECF No. 1 ¶¶ 25–26.) In July 2021, Defendant Main Line Health, Inc. announced a mandatory COVID-19 vaccination

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

requirement that required employees to be vaccinated by November 30, 2021 unless they received a religious or medical exemption. (ECF No. 1 ¶ 29; ECF No. 22-1 at 9.)

Plaintiff is a practicing Evangelical Christian. (ECF No. 1 ¶ 15.) Plaintiff requested a religious exemption from taking the COVID-19 vaccine on September 2, 2021, by submitting a narrative statement and completing a required questionnaire from Main Line Health, Inc. (ECF No. 1 ¶ 30.) Plaintiff stated the following in her narrative:

> The Pfizer and Moderna mRNA vaccines and Janssen's virus-delivered DNA vaccine injects foreign genes into people. I believe this violates God's intended design for my makeup. The vaccines deliver foreign RNA or DNA to manipulate human cells to generate "spike" proteins and then an immune response which lasts until death, thereby permanently altering each person's cellular makeup as created by God. These vaccines are gene therapy products that change a person's genetic composition as created in the image of God. Other vaccines do not include gene therapy. . . By taking a gene therapy product, I believe I would be distorting the image of God. . . I believe the Covid-9 [sic] vaccines would alter my genetic makeup and change God's creation as intended. . . The Bible teaches that I am a temple with the indwelling Holy Spirit. I think the genetically based vaccines defile God's temple. . .The technology used in these vaccines differs from all other vaccines because they contain foreign genetic material that would directly coerce my body into making foreign proteins, which other vaccines do not do. . . .

(ECF No. 1-3 at 12.) Plaintiff's religious exemption request was reviewed by the Main Line Health Religious Exemption Committee[2] and denied on September 24, 2021. (ECF No. 1 ¶ 33; ECF No. 22-1 at 5.) The Committee stated as the basis for its decision that Plaintiff did not "state a basis why [her] religious belief requires [her] to decline the COVID-19 vaccination." (ECF No. 1 ¶ 33.) In response, Plaintiff submitted an appeal request on September 28, 2021, which did not include additional information, only that she "stand[s] by [her] religious convictions" and that she had COVID as of September 14, 2021, and had "recovered. [sic] with natural immunity." (ECF No. 1 ¶ 34.)

---

[2] The Religious Exemption Committee at Main Line Health consisted of a chaplain, doctors, and HR professionals. (ECF No. 21, at 22.)

On October 8, 2021, Defendant Main Line Health, Inc. denied Plaintiff's appeal for the same reason stated in the initial denial. (ECF No. 1 ¶ 37.) Plaintiff subsequently received a letter dated October 13, 2021 from Eric Mankin, President of Main Line Healthcare, informing Plaintiff that she was in material default of her contract for her failure to receive the COVID-19 vaccination and the only remedy available was to submit to vaccination. (ECF No. 1 ¶ 38.) Plaintiff submitted an additional statement to the Religious Exemption Committee on October 17, 2021, that summarized her religious beliefs based on Evangelical Christianity. (ECF No. 1 ¶ 39.)

On October 19, 2021, Plaintiff received a call from the Main Line Health President, John J. Lynch, who informed her that no further appeal was available to her. (ECF No. 1 ¶ 40.) On October 20, 2021, Plaintiff sent a letter to Mr. Lynch summarizing their phone call from the day prior. (ECF No. 1 ¶ 41.) On October 21, 2021, Plaintiff received an email from Mr. Lynch stating in part: "I am not involved in the exemption review process," and that "it is my understanding that your [October 17, 2021] late resubmission was in fact reviewed and given additional consideration." (ECF No. 1 ¶ 44.)

Main Line Health's policy was to terminate employees who were not approved for an exemption and who declined to receive the COVID-19 vaccine by November 1, 2021. (ECF No. 22-1 at 14.) During a phone call with Plaintiff, John Schwarz,[3] Plaintiff's direct supervisor, told Plaintiff she was being discharged because her religious exemption request did not satisfy the criteria of the Religious Exemption Committee. (ECF No. 1 ¶ 47.)[4]

---

[3] John Schwarz's full title is President of Bryn Mawr Hospital and President of its Integrative and Functional Medicine Program. The Court notes that John Schwarz is alleged to be an agent of Defendant System. (ECF No.1 ¶ 24.)

[4] In response to Defendants' Motion for Summary Judgment (ECF No. 22), Plaintiff relies heavily on the opinions of two experts: Dr. Peter McCullough, M.D. and Dr. Akram Boutros, M.D.. Dr. McCullough was retained to opine on the reasonableness of Plaintiff's belief system as based on her understanding of COVID-19 and also to provide a rebuttal to the report of Dr. Daniel Salmon, Defendants' expert, who provides an expert opinion on Defendants' undue hardship defense. Dr. Akram Boutros was also retained by Plaintiff and asked to write a rebuttal report addressing Dr. Salmon's conclusions on undue hardship. This Court, on March 24, 2025, granted Defendants'

## II.  LEGAL STANDARD

A motion for summary judgment must be denied unless the moving party is able to show "no genuine dispute as to any material fact" and that the "movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "always bears the initial responsibility" of identifying the portions of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute is defined as one in which a jury could reasonably find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986). In assessing materiality, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

When the defendant moves for summary judgment, "the initial burden is on the defendant to show that the plaintiff has failed to establish one or more essential elements to her case." *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). The summary judgment standard requires the court to view the evidence in the light most favorable to the non-moving party, including all justifiable inferences. *Anderson,* 447 U.S. at 255. However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 248. If the court finds that any factual issues exist that could be reasonably resolved for either party, and thus requires the presence of a fact finder, then summary judgment must be denied. *Id.* at 250.

## III.  DISCUSSION

Plaintiff brings failure to accommodate and disparate treatment claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA").

---

Motion to Exclude Plaintiff's Expert Report and Opinion. (ECF No. 33.) As a result, The Court does not consider the Reports and Opinions of Dr. McCullough or Dr. Boutros.

5

The Court will discuss the Title VII and PHRA claims under the same analysis as "discrimination and retaliation claims under the PHRA are generally interpreted in the same way as Title VII [claims]." *Butt v. Phila. Housing Auth.*, No. 18-4770, 2024 WL 625274 n. 6 (E.D. Pa. 2024) (citing *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 791 n. 8 (3d Cir. 2016)).

    a. Failure to Accommodate

In order to establish a *prima facie* case of failure to accommodate, an employee must show: (1) she holds a sincere religious belief that conflicts with a job requirement; (2) she informed her employer of the conflict; and (3) she was disciplined for failing to comply with the conflicting requirement. *Gray v. Main Line Hospitals, Inc.*, 717 F. Supp. 3d. 437, 445-46 (E.D. Pa. 2024) (citing *EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 271 (3d Cir. 2010)). If a plaintiff meets the standard for a *prima facie* case, the employer must show that providing reasonable accommodations would be an "undue hardship" and result in "substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023). In this matter, Defendants do not contest whether or not Plaintiff held a "sincere religious belief" but concede that point. Rather, Defendants contend that Plaintiff's bases as stated by her for requesting the religious exemption were not religious in nature but were, instead, scientific in nature and therefore unprotected by statute. Furthermore, Defendants contend that Plaintiff's request, even if it was determined to be religious in nature, would have placed an undue hardship on Defendants which would be a complete defense to a failure to accommodate claim.

In determining whether a belief is religious in nature, those beliefs must "address[] fundamental and ultimate questions having to do with deep and imponderable matters," that are "comprehensive in nature," and are accompanied by "certain formal and external signs." *Fallon v. Mercy Catholic Med. Ctr. of S.E. Pa.*, 877 F.3d 487, 491 (3d Cir. 2017).

In *Fallon*, the district court dismissed Plaintiff's claims for religious discrimination based on Title VII. *Id*. at 488. On appeal, the Third Circuit affirmed. *Id.* at 494. The District Court determined that Fallon's beliefs, while sincerely and strongly held, were not religious in nature. Specifically, Fallon requested an exemption from the flu vaccine due to his belief the flu vaccine would harm his body and that he is generally worried about the health effects of the flu vaccine. *Id.* at 488. The Third Circuit held that reliance on one general moral commandment: "Do not harm your own body" is not a comprehensive system of beliefs about fundamental or ultimate matters. *Id* at 492. Furthermore, the District Court concluded that his concern about the vaccine and its effects was a medical belief and not a religious one. *Id.*

*Fallon* provides persuasive guidance to this Court and thus, the Court finds the same here as in *Fallon*. Plaintiff writes in her exemption request that the COVID-19 vaccine does not "use the same technology" as other vaccines. (ECF No. 22-8 at 8.) Plaintiff further delves into the medical technology used to develop the "mRNA vaccines" that allegedly "permanently alter[s] each person's cellular makeup." (*Id.*) Plaintiff also details that this vaccine contains "foreign genetic material that would directly coerce [their] body into making foreign proteins." (*Id.*) These are excerpts from Plaintiff's exemption request, which contains language similar to that in *Fallon* –that is, medical or scientific beliefs about a particular medical device or mechanism, in this instance a vaccine, that are couched with religious language. The Court is not in the position to, nor required to, make a conclusion on the scientific technology of the COVID vaccine or its impact on a human body. The Court is only tasked with assessing, at this stage, whether there is a genuine dispute of fact as to whether Plaintiff's beliefs are scientific or religious in nature. The Court, having determined that there is no dispute of fact present here, has determined that based on the uncontroverted facts in the record, Plaintiff's request is scientific and/or medical in nature, not

7

religious. This determination is bolstered by the fact that Plaintiff had taken vaccines before, including the flu vaccine without issue or concern. Plaintiff's objections to vaccinations only arose when a new technology was involved in the creation of vaccines, "mRNA technology." The issue the Plaintiff's asserts in her argument as to the mechanism used in the creation of the COVID-19 vaccine and its resulting effects as to what it is designed to do medically, presents to this Court a similar circumstance that was contemplated by the Court in *Fallon*. The fact that Plaintiff has stated their disagreement of vaccines is based on this new technology, and not on vaccinations in general, underscores the fact that Plaintiff's exemption request is scientific in nature, and not religious.

While the determination that the Court has made above is sufficient to limit the need for further deliberation under the failure to accommodate analysis, the Court deems it appropriate to address the issue of undue hardship. The establishment of undue hardship is a complete defense from a failure-to-accommodate claim. Title VII requires employers to accommodate sincerely held religious beliefs insofar as the accommodations do not impose an undue hardship on the conduct of the employer's business. 42 U.S.C. § 2000e (j). Even if this Court were to find that Plaintiff established a *prima facie* case of failure-to-accommodate by demonstrating that she had a sincerely held religious belief that conflicted with a job requirement which was known to the employer and that the employer took an adverse action against her based on that belief and her failure to comply, Defendant has established that accommodating Plaintiff's beliefs would have imposed an undue hardship on their business.

The Supreme Court has clarified the meaning on "undue hardship" defining it as when an accommodation "would result in substantial increased costs in relation to the conduct of its particular business." *Groff*, 600 U.S. at 470. The Third Circuit has recognized both economic and

non-economic costs as potential undue burdens on employers. *E.E.O.C. v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010). Courts evaluating undue hardship focus on "the specific context of each case, looking to both the fact as well as the magnitude of the alleged undue hardship." *Id.* at 273. In deciding whether the proposed accommodation would have imposed an undue hardship on Defendant, the Court considers (1) the specific position of Plaintiff along with (2) the context in which she works. Plaintiff was the Medical Director of the Main Line Health Integrative and Functional Medicine Services Program. (ECF No. 1 at ¶16.) As Medical Director, she provided primary care to patients and was required by contract to provide forty (40) hours of direct patient care per week. (*Id.*)

Defendants claim that allowing Plaintiff to engage in forty (40) hours of direct patient care per week, without receiving a vaccination, would have been an undue burden on Defendants' business. In support of their showing undue hardship, Defendants rely primarily on *Bushra v. Main Line Health, Inc.*, 709 F. Supp. 3d 164 (E.D. Pa. 2023). In *Bushra,* the Plaintiff was an emergency room doctor who was denied a religious exemption request. *Id.* This Court in *Bushra*, granted summary judgment on the ground that granting an accommodation to Dr. Bushra would have been an undue burden considering the elevated risk of COVID exposure for medical professionals involved in direct patient treatment. *Id.* at 175–76.

Plaintiff, in this case, claims that there were alternative measures available to her that would have been reasonable accommodations. Amongst these alternative safety measures, according to Plaintiff, were transferring Plaintiff to a different department, practicing telemedicine, and wearing personal protective equipment ("PPE"). Plaintiff also argues that *Bushra* is not exactly on-point in the present case because *Bushra* involved an expert presented by the defendant, while there was no expert provided by the plaintiff, Dr. Bushra. Plaintiff also asserts that the

9

accommodations requested by her in this case could not have been deemed an undue burden because other individuals were granted exemptions and accommodations. However, in this instance, since the expert reports provided by Plaintiff have been excluded, this case is on point with *Bushra*.

In determining undue hardship, the Court focuses on the "substantial increase in cost" standard articulated by the Court in *Groff*. These costs, as stated before, can be economic and non-economic. In the present case, considering that Defendant is a hospital, the Court focuses on the non-economic—i.e., health and safety cost—of granting Plaintiff's exemption request. Plaintiff was a medical director at a hospital during the COVID pandemic. She was responsible, contractually, to engage in 40 hours of *direct patient care* a week. Defendant's expert, Dr. Salmon opines that health care personnel were at an increased risk of exposure to COVID-19 cases. (ECF No. 22-9, at 7.) In particular, Dr. Salmon states that health care workers with direct patient care had 4 times the risk of contracting COVID-19 compared with health care workers without direct patient care. (*Id.* at 6.) And logically speaking, the increased risk of contracting COVID-19, which may be a knowing decision by the physician who elected not to receive the vaccine, would have translated to an increased, unknown risk for the direct patient care recipient.

The Court is not equipped, nor does it need to opine on the dangers, if any, of the COVID-19 vaccine on a human body, only whether Main Line Health had an undue burden in accommodating Plaintiff. This question, as it relates specifically to Defendant, is not one of first impression before this Court. The Third Circuit, in a non-precedential opinion, has recently issued an opinion on this exact subject—*Bushra v. Main Line Health*. In *Bushra v. Main Line Health*, which concerned facts quite similar to those before the Court in the present case, the Third Circuit held that Defendant Main Line Health—the same Main Line Health that is a Defendant in the

present case—presented a successful undue hardship defense, resulting in a complete defense to the Plaintiff's case. *Bushra v. Main Line Health, Inc.*, No. 24-1117, 2025 WL 1078135, at *2 (3d Cir. Apr. 10, 2025) (non-precedential). Similarly in this case, "without any information on other employees granted accommodations, we cannot reasonably infer that MLH accommodated similarly situated staff. [plaintiff's] assertion that an unknown number of unnamed employees received unidentified accommodations does not rebut MLH's substantial evidence that it could not accommodate him." *Id.*

Plaintiff was in a unique position as a director at Main Line Health. She was contractually required to provide 40 hours of *direct patient care* per week. There have been no comparators, or evidence provided by Plaintiff, that would support a conclusion that accommodating Plaintiff would not have been an undue burden. Quite the contrary, the facts as stated in the record demonstrate significant potential non-economic costs, such as a patient who has direct contact with Dr. Slattery, contracting COVID-19 which, as stated by the Court in *Bushra*, and testified to by Dr. Salmon, could lead to death. That is a risk and cost to health and safety that is immeasurable, and of which there is no turning back from the finality of the potential loss of life for a person who may contract COVID-19. Moreover, the Court cannot ignore, the enhanced possibility of contracting it at a place where patients who are sick and in need of medical care, emergent or long term, go for treatment from a physician who they presume is safe and will not expose them to a potentially grave illness. There is no genuine dispute of material fact on this issue. As a result, the Court will hold consistent with the Third Circuit that the Defendant has met their burden of showing an undue hardship in accommodating Plaintiff's accommodation request.

b. Disparate Treatment

A disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than other similarly situated individuals on the basis of an impermissible criterion. *Boyle v. City of Phila.*, 476 F. Supp. 3d 101, 111 (E.D. Pa. 2020) (citing *O'Brien v. City of Phila.*, 837 F. Supp. 692, 697 (E.D. Pa. 1993). There are two types of analyses that apply to disparate treatment claims, the "pretext theory" of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and the mixed-motive theory of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). *Id.* at 111–12. Plaintiff does not argue for a mixed-motive theory of disparate treatment; Therefore, the Court will only analyze the pretext theory of *McDonnell Douglas*.

i. Pretext Theory

Under the Pretext Theory, in order to establish a *prima facie* case of discrimination a plaintiff must show 1) they are a member of a protected class, 2) they were qualified for the position they sought or retained, 3) they suffered an adverse employment action, and 4) non-members of the protected class were treated more favorably. *Tolani v. Upper Southampton Twp.*, 158 F. Supp. 2d 593 (E.D. Pa. 2001).

The Court in this instance focuses particularly on the last prong, that non-members of the protected class were treated more favorably. "[A] prima facie disparate treatment claim requires allegations demonstrating that 'nonmembers of the protected class were treated more favorably." *Wilhoit v. AstraZeneca Pharma. LP*, No. 22-1634, 2024 WL 2843169, at *2 (D. Del. 2024) (dismissing plaintiff's disparate treatment claim because they failed to show that non-members of plaintiff's protected religious class were subject to favorable treatment). In the present case, Plaintiff contends that she was discriminated against in regard to her vaccine exemption because

12

of her status as an Evangelical Christian. However, Plaintiff was unable to distinguish which classes of people, or non-members, were treated more favorably than Plaintiff. Plaintiff did not provide any evidence that other religious denominations were granted vaccinations exemptions. Plaintiff was also unable to provide any evidence that different levels of religiosity were treated differently. In fact, Plaintiff asserts that "sixty percent of people who applied for religious exemptions" were able to receive them. (ECF No. 30 at 53:23-25.) However, that number alone does not establish that non-members of Plaintiff's class, which is not established on the record, were treated more favorably than Plaintiff. Moreover, the fact that 60% of people who applied for *religious* accommodations were approved, would mean that religious discrimination was less likely to occur, specifically without any evidence of which groups or which levels of religiosity were granted such exceptions. If there were evidence that Plaintiff was the only Evangelical Christian who was denied accommodations or that Plaintiff, being the most religious, was denied accommodations, that would present itself as a more convincing argument. But such argument was not made nor is there evidence on the record to support such a conclusion. For these reasons, Plaintiff does not meet her *prima facie* burden, and her disparate treatment claim does not survive.

## IV.     CONCLUSION

After a review of the entire record, there is no genuine dispute of material fact with regards to whether Plaintiff held a sincerely held *religious* belief as the basis for her vaccination exemption request—the record indicates she does not. Rather, the record demonstrates that her beliefs are scientific in nature. Furthermore, even if this Court were to hold that Plaintiff did, in fact, have a sincerely held *religious* belief as a basis for her vaccination exemption request, the record provides sufficient evidence that it would have been an undue hardship for Defendants to accommodate Plaintiff's request. Plaintiff's contract required that she provide 40 hours of direct patient care per

week; she could not have done so, while unvaccinated, without the risk of exposing her patients to COVID-19 and possible grave consequences. For these reasons, Defendants Motion for Summary Judgment is granted.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**
_____
    **HODGE, KELLEY B., J.**
